UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF THE ARREST OF
BRANDON SPENCE, A.K.A. "SPUN" AND          Case No. 3:24-MJ-
THE SEARCHES OF THE TARGET
PREMISES, TARGET VEHICLES 1 AND 2,         **Filed Under Seal**
AND THE TARGET TELEPHONE

**MASTER AFFIDAVIT**

I, Abhilash Pillai, having been duly sworn, do hereby state:

**INTRODUCTION**

**1.**      I am a Detective with the Hartford Police Department ("HPD") and have been
employed as a Hartford Police Officer since 2004.  My responsibilities as a Hartford Police officer
include investigating and enforcing city and state criminal laws.  I am also currently assigned to
the Northern Connecticut Gang Task Force, which is a Federal Bureau of Investigation (FBI)
sponsored task force consisting of law enforcement agents from the FBI, and officers and
detectives from the Hartford Police Department, East Hartford Police Department, West Hartford
Police Department, New Britain Police Department, Connecticut Department of Correction and
the Connecticut State Police.  The Task Force is dedicated to combatting violent crime and firearms
and narcotics violations in and affecting Hartford, Connecticut, and the surrounding areas.  As a
member of the Task Force, I have been duly deputized as a Special Deputy United States Marshal
and FBI Task Force Officer pursuant to 18 U.S.C. § 2510(7), which authorizes me to investigate
violations of federal criminal law and to make arrests for offenses enumerated in 18 U.S.C. § 2516.
I am also a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal
Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly
authorized by the Attorney General to request a search warrant.

2.      I attended the Hartford Police Academy in Hartford, Connecticut, where I received law enforcement training, to include firearms training, the execution of search and seizure warrants, investigative techniques, and legal instruction, which covered Fourth Amendment searches and seizures.  I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations.  I have executed seizure warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities.

3.      During my career in law enforcement, I have participated in investigations involving the illegal distribution of controlled substances, firearms and gang related acts of violence to include homicides, shootings, robberies and home invasions. I have coordinated controlled purchases of illegal drugs and firearms utilizing confidential sources and cooperating witnesses.  I have written and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and provided testimony in Federal and State Grand Jury proceedings. I have also interviewed admitted drug traffickers, drug users, gang members, informants and cooperating defendants, as well as local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders.

4.      I am one of the case agents who has directed the investigation that is the subject of this Affidavit in conjunction with law enforcement agents and officers, and I am thoroughly familiar with the information contained herein.

5.      One purpose of this Affidavit is to establish probable cause for an arrest warrant and criminal complaint charging **Brandon SPENCE**, a.k.a. "Spun" (DOB xx-xx-1988) with violating Title 21, United States Code, Section 841(a)(1) and (b)(1)(C) (Possession with the Intent to Distribute and Distribution of a Controlled Substance).

6.      This Affidavit is also submitted for the purpose of establishing probable cause for the issuance of warrants to search the following locations:

      a.   The premises located at ▮▮▮▮▮▮▮▮, East Hartford, Connecticut ("**Target Premises**"), which is believed to be SPENCE's current residence. The building is located on the south-west side of Forest Street and is a single-family residence that is primarily yellow in color. The **Target Premises** has the numbers "▮▮" clearly written in black, to the right of the front door. The requested warrant would authorize the search of the premises described in Attachment A-1 for the evidence described in Attachment B.

      b.   A white 2023 Subaru Ascent with Vehicle Identification Number (VIN) ▮▮▮▮▮▮▮▮▮5501 ("**Target Vehicle 1**"). **Target Vehicle 1** has been observed bearing Connecticut marker plate BM-19679 and is used by SPENCE to facilitate his drug trafficking activity. The requested warrant would authorize the search of the vehicle described in Attachment A-2 for the evidence described in Attachment B.

      c.   A black 2023 Dodge Durango with Vehicle Identification Number (VIN) ▮▮▮▮▮▮▮▮▮5579 ("**Target Vehicle 2**"). **Target Vehicle 2** has been observed bearing Illinois marker plate FP 190989 and is used by SPENCE to facilitate his drug trafficking activity. The requested warrant would authorize the search of the vehicle described in Attachment A-3 for the evidence described in Attachment B.

      d.   The cellular phone assigned phone number ▮▮▮▮▮-3047 and International Mobile Subscriber Identity (IMSI) number ▮▮▮▮▮▮▮7973 ("**Target Telephone**"). This device is used by SPENCE to facilitate his drug trafficking activity. The requested warrant would authorize the forensic examination of the device described in Attachment C for the purposes of identifying electronically stored information particularly described herein and in Attachment D.

7.      As detailed herein, there is probable cause to believe that SPENCE is using the **Target Premises** to store drug proceeds and to store and process and facilitate the distribution of controlled substances, and that SPENCE is using **Target Vehicle 1**, **Target Vehicle 2**, and the **Target Telephone** to facilitate his drug trafficking activity. For the reasons detailed herein, there is probable cause to believe that searches of the locations identified above will reveal evidence, contraband, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with the Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Violate Federal Narcotics Laws), and 843(b) (Use of a Communications Facility to Facilitate Drug Trafficking Offenses) ("Target Offenses").

## PROBABLE CAUSE

8.      The United States, including the FBI, is conducting a criminal investigation of Brandon SPENCE, a.k.a. "Spun" and others.  The individuals under investigation are believed to be members of a drug trafficking organization ("DTO") operating the "North-End" section of Hartford, Connecticut, which distributes fentanyl, marijuana and cocaine base. SPENCE and his associates are believed to distribute drugs through a network of trusted mid-level and street-level redistributors.

9.      Beginning in or about January 2024, FBI investigators began receiving information from a HPD Confidential Informant (referred to herein as "CI-1") who has knowledge of SPENCE and his DTO.  A description of, and background information about, CI-1, who was debriefed in connection with this investigation, is set forth below.  CI-1 is a confidential source, who has been monetarily compensated in exchange for information and services provided to Law Enforcement. CI-1 began cooperating with the HPD in ▮▮▮. In the last ten years, CI-1 has had multiple prior convictions, including misdemeanor and Felony convictions. The information provided by CI-1

has been accurate and has been corroborated in part by independent information obtained by investigators in the current investigation into SPENCE and his associates. To my knowledge, CI-1 has not knowingly provided any false information. In January of 2024, CI-1 was shown a photograph of SPENCE and identified him as "Spun."

10.     The information provided by CI-1 has proven to be reliable and trustworthy. CI-1's knowledge of SPENCE and his distribution operation is based on personal interactions with SPENCE, as well as access to the phone number for the **Target Telephone**, which is utilized to sell street level amounts of narcotics.

11.     CI-1 stated that SPENCE and his associates were utilizing ████████████████ ████████████████████████████ as a "stash" apartment for their drugs and firearms. CI-1 stated that s/he has been inside the apartment on several occasions in the past and has personally seen large quantities of crack cocaine and fentanyl inside. CI-1 stated that several other associates of SPENCE were utilizing this apartment to "stash" their drugs. CI-1 stated that SPENCE conducts the majority of his drug sales from ████████████████████████████ ████████████████████████████████████████ ████████████████. CI-1 stated that SPENCE would arrive around the area of the mentioned gas stations between 5:30 a.m. and 7:30 a.m. on a daily basis. Once at ████████████, SPENCE would park his vehicle within one of the parking spots and conduct his illegal drug sales from inside his Subaru. In addition to the information about SPENCE's drug sales, CI-1 stated that SPENCE was in possession of several firearms. According to CI-1, the firearm that SPENCE often possessed was a black colored Glock firearm, which CI-1 believed was a .40 caliber. CI-1 was an individual that was familiar with firearms and believed that the firearm SPENCE was in possession of was real.

12.     CI-1 believes that SPENCE lives outside of Hartford, CT, but was unsure as to where he lived. CI-1 stated that SPENCE was operating a newer model, white colored Subaru SUV. A marker plate for the Subaru was provided by CI-1, and was identified as Connecticut BM 19679. A check of the marker plate revealed that it was registered to a white 2023 Subaru Ascent Touring and the vehicle was leased to Brandon SPENCE, date of birth xx/xx/1988, with an address of ███████████, East Hartford, Connecticut.

13.     Beginning in or about February 2024, FBI investigators began receiving information from another HPD Confidential Informant (referred to herein as "CI-2") who has knowledge of SPENCE.  A description of, and background information about, CI-2, who was debriefed in connection with this investigation, is set forth below. CI-2 is a confidential source, who has been monetarily compensated in exchange for information and services provided to Law Enforcement. CI-2 began cooperating with the HPD in ███. CI-2 has several prior misdemeanor and Felony convictions. The information provided by CI-2 has been accurate and has been corroborated in part by independent information obtained by investigators in the current investigation into SPENCE. To my knowledge, CI-2 has not knowingly provided any false information. In February of 2024, CI-2 was shown a photograph of SPENCE and identified him as "Spun."

14.     CI-2 stated that SPENCE was selling large amounts of crack cocaine from ████ ████████████████████████████████████████████ with ████-6386 as SPENCE's wireless phone, which according to CI-2 was the phone that SPENCE utilized for his illegal drug sales. CI-2 stated that SPENCE was in possession of a dark colored firearm, which SPENCE had for protection. CI-2 was an individual that was familiar with firearms and believed that the firearm SPENCE was in possession of was real.

15.     Your affiant and other investigators were familiar with SPENCE. For example, on February 5, 2019, Judge A. Thompson sentenced SPENCE to 24 months of imprisonment and three years of supervised release for unlawful possession of a firearm by a felon. SPENCE was released from federal prison in February 2020. At approximately 9:30 a.m. on December 7, 2020, Hartford Police surveillance cameras captured SPENCE and another individual engaged in a dispute in a parking lot at ████████████ in Hartford. SPENCE pulled out a firearm, shot the individual in the leg, and then stole the victim's vehicle. In March 2021, SPENCE was sentenced to 24 months of imprisonment for violating the conditions of his federal supervised release.

### Controlled Purchase from SPENCE on ████████████

16.     On ████████████ conducted a controlled purchase of █████ from SPENCE. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.,

████████████████████████████████████████████████████████

████████████████████████

██      ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

██      ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

**Controlled Purchase from SPENCE on** ████████.

19.    On ████████, investigators attempted to conduct a controlled purchase from

SPENCE. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

██  ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

██  ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ .

**Surveillance of SPENCE's Subaru on March 14, 2024**

24.      Based on the aforementioned information, and on March 14, 2024, your affiant utilized one of the HPD Capitol Command Center (C4) stationery surveillance cameras and conducted surveillance of the areas of  in Hartford. The surveillance observations were recorded, which are listed below.

-6:44:08 a.m. Your affiant observed **Target Vehicle 1** exiting from the parking lot of ▮ ▮ and traveling westbound.

-6:45:23 a.m. Your affiant observed **Target Vehicle 1** reversing into one of the parking spots of the ▮.

-7:03:28 a.m. Your affiant observed an unknown individual approach the front passenger window of **Target Vehicle 1** and speak to the occupant(s) of the vehicle. Later, this individual was observed walking away from **Target Vehicle 1**.

-7:31:14 a.m. Your affiant observed an unknown individual approach the front passenger window of **Target Vehicle 1** and speak to the occupant(s) of the vehicle. Later, this individual was observed walking away from **Target Vehicle 1**.

-8:08:15 a.m. Your affiant observed **Target Vehicle 1** drive off from its parked position and travel westbound on ▮.

25.      Based on the March 14, 2014 surveillance operation, your affiant verified the information provided by ▮ about SPENCE arriving early in **Target Vehicle 1** at the identified ▮ and conducting suspected hand-to-hand drug transactions.

**Identification of SPENCE's New Wireless Phone Number**

26.      On March 18, 2024, the Honorable United States Magistrate Judge Thomas O. Farrish signed a search warrant affidavit for SPENCE's previously identified phone, which was

█████-6386. On March 19, 2024, the phone Provider [T-Mobile] began providing phone information for phone number █████-6386. Investigators checked the information obtained and verified that there was no activity on phone number █████-6386 since March 16, 2024. This led investigators to believe that SPENCE might have changed his phone number.

27.    On March 20, 2024, your affiant placed several outgoing phone calls to phone number █████-6386. The phone calls would go directly to an automated voice mail message, which indicated that SPENCE's phone was turned off. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

██    ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████    Your affiant believed that SPENCE was now utilizing the **Target Telephone**

for his illegal drug transactions. For investigative purposes, investigators checked several Law Enforcement databases and non-Law Enforcement databases pertaining to the **Target Telephone.** Information obtained indicated that the **Target Telephone** was assigned to Brandon Darnell SPENCE.

29.      On March 22, 2024, the Honorable United States Magistrate Judge Thomas O. Farrish signed a search warrant affidavit for the **Target Telephone**. On March 25, 2024, the phone Provider [T-Mobile] began providing phone information for phone number ████-3047, the number for the **Target Telephone**. An analysis of the **Target Telephone** pings revealed that it was stationery around the area of ████████, East Hartford, CT, during the early morning hours. It also showed that the **Target Telephone** would leave the identified East Hartford location between 4 a.m. and 6 a.m. Later, the phone would ping in the area of ██████████████ ████ in Hartford. This led investigators to believe that SPENCE resides at ████████, East Hartford, CT, and leaves his residence in the early morning hours with illegal drugs. SPENCE would then arrive in the areas of ██████████████ in Hartford to conduct illegal drug transactions, which is evident from the ██████ and ██████████ controlled narcotics purchases.

## Surveillance of Spence on March 27, 2024

30.      ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████ Based on this information, your affiant checked the active ping information on SPENCE's identified phone. The pings indicated that SPENCE's phone was in the area of ██ ████████, East Hartford, CT. For investigative purposes, your affiant arrived at ██████

████, East Hartford, CT, at approximately 5:56 p.m. and observed SPENCE's identified Subaru parked in the driveway of the identified residence.

**Controlled Purchase from SPENCE on ████████**

31.    Based on the aforementioned information, which included the two prior controlled narcotics purchases, the surveillance operations involving SPENCE and the information obtained from SPENCE's wireless phone, investigators decided to set up surveillance at ████████, East Hartford, CT. The operational plan was for investigators to locate SPENCE at his residence and conduct surveillance on him. If SPENCE was followed back to Hartford, investigators were going to utilize another FBI Confidential Human Source (CHS-2) to conduct a controlled purchase of ████████████ from SPENCE. CHS-2 is a registered informant with the HPD and FBI, and CHS-2 has been providing information since ████. CHS-2 has previously provided information to investigators that has led to the seizure of narcotics and weapons, as well as led to the arrests of individuals for narcotics and firearms violations. Accordingly, I along with other investigators believe that CHS-2's information is trustworthy and reliable. CHS-2 has been cooperating with investigators and providing information for monetary compensation.

32.    At approximately 3:30 a.m. on March 28, 2024, your affiant along with other investigators started the surveillance operation at ████████, East Hartford, CT. During the course of the surveillance, investigators observed **Target Vehicle 1** parked in the driveway of ████████, East Hartford, CT. At approximately 4:09 a.m., your affiant observed an unknown individual walking away from the door of ████████ and opening the front driver side door of **Target Vehicle 1**. This individual then entered **Target Vehicle 1**. Later, the headlights of **Target Vehicle 1** turned on and the vehicle drove away from its parked position. **Target Vehicle 1** then took a right turn onto Forest Street and traveled towards Forbes Street. For investigative

purposes, investigators followed **Target Vehicle 1** to the on-ramp area of Route 2, towards Hartford. At this location, investigators lost sight of **Target Vehicle 1**.

33.      For investigative purposes, your affiant checked the active ping information on SPENCE's identified phone. The pings arrived every ten minutes with an updated location. After ten minutes of losing sight of SPENCE, the phone ping indicated that SPENCE's phone was in the Northeast section of Hartford, CT, and the ping covered a half mile radius. At approximately 4:30 a.m., your affiant observed two marked HPD Police cruisers parked in the area of ███████████ ██████████, Hartford. The police vehicles were within close proximity of ███████████████ ████, Hartford, CT, which led investigators to believe that SPENCE was driving around to avoid making contact with Law Enforcement. Later, investigators observed **Target Vehicle 1** traveling east on ████████████████. Investigators followed the Subaru to the area of ████████████████, where investigators once again lost sight of the vehicle. After ten minutes of losing sight of SPENCE, the phone ping indicated that SPENCE's phone was in the Northeast section of Hartford, CT. Your affiant monitored SPENCE's phone ping for the next hour, which showed that SPENCE's phone was moving around within the Northeast section, and that the phone was never stationery at one location. As investigators attempted to locate SPENCE, the two marked police cruisers remained parked in the area of ███████████████ ████.

34.      Shortly after the marked police cruisers left, which was around 6 a.m., SPENCE's phone was pinging around the areas of ████████████████ in Hartford. At approximately 6:57 a.m., your affiant observed **Target Vehicle 1** parked within one of the parking spots at ██ ████████. From 6:58 a.m. to 7:26 p.m., your affiant and other investigators observed several unidentified individuals approaching the front passenger and front driver side window of **Target**

**Vehicle 1**. Several minutes later, these same individuals were observed walking away from **Target Vehicle 1**. At approximately 7:27 p.m., investigators observed **Target Vehicle 1** driving off from its parked position and arriving at the parking lot area of the ████████, located at ████████ ████, Hartford, CT.

35. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

██  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

38. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

**<u>Controlled Purchase from SPENCE on ████████</u>**

39.    On ████████, investigators conducted a controlled fentanyl purchase from SPENCE, utilizing ████. ████████████████████████████████████████████

44.     As detailed in this affidavit, your affiant obtained a search warrant for the **Target Telephone**. A location analysis of the **Target Telephone** indicates that SPENCE typically leaves the **Target Premises** on a daily basis between the hours of 3:30 a.m. and 5:30 a.m. This is evident from the ▮▮▮▮▮▮▮▮ controlled purchase, in which SPENCE left the **Target Premises** at approximately 4:09 a.m. In order to safely arrest SPENCE, investigators will need to execute the search/arrest warrants prior to 6 a.m.

## DRUG TRAFFICKERS' USE OF RESIDENCES AND OTHER PROPERTIES FOR DRUG TRAFFICKING PURPOSES

45.     During my tenure as a law enforcement officer, your affiant has investigated and participated in numerous operations which involved drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms

laws.  My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations.  Search warrants relating to these investigations have covered vehicles, residences of drug traffickers and their co-conspirators, "stash houses" used as storage and distribution points for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

46.    Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; wireless telephones, paging devices, computers and computer disks, answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking.  These items obtained by search warrants constituted evidence of drug trafficking violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

47.    Based on my training, experience, and participation in this and other drug trafficking investigations, I know that:

    a.   drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

    b.   drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.  drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business;

e.  drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

f.  drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h.  drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i.  drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j.  drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k.  drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and

other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.   drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m.  persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.   drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug trafficker's possession or residence;

o.   the State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However, it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.  It is known that drug traffickers' methods include, but are not limited to:  commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers.  It is known that the residences of drug traffickers will often contain records of drug related travel.  These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p.   based on my training and experience, drug traffickers commonly have firearms, ammunition and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, knives, ammunition, and magazines. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

q.   based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars, or those of trusted associates.  This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutants;

r.  based on my training and experience, drug dealers often create secret locations, commonly called "traps" or "hides" in their automobiles and residences.  Often, drug dealers will use these traps or hides to conceal and store narcotics, weapons, money and other items and documents related to their drug trade; and

s.  based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities in their cars, homes, garages and out-buildings.

48.    Based on the information set forth herein, I believe that SPENCE is using the **Target Premises** to conduct his drug business and that evidence of his drug trafficking crimes will be found at that location. The **Target Premises** is SPENCE's residence and therefore most likely contains drug proceeds and records of drug trafficking (such as additional cell phones).

## ADDITIONAL INFORMATION ABOUT CELL PHONE USE

49.    With regard to the **Target Telephone**, I request permission to enter and search the device for evidence relating to the Target Offenses, including evidence of communications between and among SPENCE and/or other co-conspirators involved in the Target Offenses.  Based on my training and experience, and as set forth in this affidavit, I believe that SPENCE has used and continues to use the **Target Telephone** to facilitate the distribution of controlled substances. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses of businesses associated with criminal activity such as locations used to conceal or secure evidence, as well as renting or leasing vehicles used by co-conspirators to commit the Target Offenses.  Internet browsing history could also identify the user of the **Target Telephone** based on the website and locations they access.  Also based on my training and experience, wireless phones may contain videos and images of coconspirators, their possession of evidence associated with the Target Offenses, weapons and tools used to commit the Target Offenses, locations visited by SPENCE,

and other co-conspirators, before, during, and after the crimes committed.  I also know that such images or videos might be stamped with a date and time, as well geolocation data, that would assist investigators in establishing a timeline and locations relevant to the Target Offenses.  I also know based on my experience and training that some wireless phones are equipped with GPS data, which would also show locations relevant to SPENCE's commission of the Target Offenses.

50.     Based upon my training and experience, I am familiar with the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, and those methods employed by narcotics traffickers to avoid detection by law enforcement.

51.     From my training and experience, I know that narcotics traffickers often use wireless telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that by doing so they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs, guns and/or other assets.  I also know that such individuals often frequently "drop" or "change" their cellular telephones, i.e. terminate usage of one cellular telephone and begin usage of a new cellular telephone, in an attempt to thwart the efforts of law enforcement, and often possess and use multiple cellular telephones interchangeably for the same reason.  Furthermore, I know that drug traffickers and the couriers and transporters that work for sources of supply often compartmentalize operations by using different phones to communicate with different re-distributors so that if one part of the distribution operation is compromised by law enforcement, other aspects of the operation remain intact.  The use of multiple cell phones at the same time is one way to achieve such compartmentalization.  I and other law enforcement officers that I work with in drug investigations have had the opportunity to obtain search warrants for cell phones in the past. The execution of these search warrants has

resulted in the recovery of, among things, text messages, photographs, WhatsApp messages, Facebook messages, and phone contacts that have constituted evidence of drug trafficking.

52.     The **Target Telephone** is a smartphone. I know that most smartphones retain data including, but not limited to, Bluetooth data, Wi-Fi connectivity data, contacts, text messages, voicemails, and GPS location data.  There is probable cause to believe, and I do believe, that location information stored on the **Target Telephone** may reveal the location of co-conspirators, stash house locations, and a pattern of life of participants in the drug trafficking activity being investigated here.

53.     I know that most phones enable location services which allow carriers and third-party application and websites to gather and use information based on the current location of the phone to provide a variety of location-based services.  Location services associated with the phone use GPS and Bluetooth (where available) along with crowd-sourced Wi-Fi hotspot and cell tower locations to determine the device's approximate location.  There is probable cause to believe, and I do believe, that location information stored on the **Target Telephone** may reveal the location of co-conspirators, stash house locations, and a pattern of life of participants in the drug trafficking activity being investigated here.

54.     Based on my training and experience and discussions with other investigators, it is known that persons who smuggle and transport illegal narcotics frequently use cell phones to maintain contact with co-conspirators during travel and also use cell phones to contact persons where the drugs are destined. This frequently occurs due to the transient nature of these smuggling operations and because members of these conspiracies frequently travel and require coordination of their movements in order to pick up and drop off drugs at designated times and places.

55.     Based on my training and experience, and consultation with, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

     a.   the telephone phone number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device(s);

     b.   call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device(s);

     c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

     d.   records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

     e.   information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

     f.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

     g.   saved searches, locations, and route history in the memory of said device(s); and

     h.   internet browsing history, to include, internet searches in the memory of said device(s).

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS OF THE TARGET TELEPHONE

56.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

57.     *Forensic evidence.*  As further described in Attachment D, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephone** was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephone** because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

 b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

 c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

 d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

 e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

 f. I know that when an individual uses an electronic device to communicate about drug trafficking activity and to arrange narcotics transactions, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

58.     *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Telephone** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

59.     Searching for the evidence described in Attachment D may require a range of data analysis techniques.  In some cases, agents and analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment D, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment D.

## **CONCLUSION**

60.     On the basis of the foregoing information, I submit that there is probable cause for, and request that the Court issue, an arrest warrant for Brandon SPENCE and a criminal complaint

charging him with violations of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C) (Possession with the Intent to Distribute and Distribution of a Controlled Substance).

61.     I also submit that this affidavit establishes probable cause to search the property described in Attachments A-1, A-2, and A-3 for the items described in Attachment B and the property described in Attachment C for the items described in Attachment D for evidence, contraband, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with the Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Violate Federal Narcotics Laws), and 843(b) (Use of a Communications Facility to Facilitate Drug Trafficking Offenses). I therefore request that the Court issue the proposed search warrants.

62.     As discussed above, the investigation has revealed that SPENCE typically leaves the **Target Premises** on a daily basis between the hours of 3:30 a.m. and 5:30 a.m. Therefore, there is good cause to authorize the execution of these warrants at any time day or night in order to allow law enforcement officers to execute the warrants prior to SPENCE leaving the **Target** Premises, which will provide a safer environment for all of those involved with the execution of the arrest and search warrants,

63.     *Request for Sealing.* It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of the arrest and search warrants. I believe that sealing these documents is necessary because the disclosure of the affidavit, applications, warrants, complaint, and all attachments thereto, may jeopardize the investigation by causing individuals involved in criminal activity to take measures to avoid detection by law enforcement agents and flee the jurisdiction; to conceal the true identity of individuals involved in the illegal drug trafficking activity and the scope of their illegal drug trafficking activities; to

conceal the methods used in the possession and distribution of controlled substances; and to destroy or conceal evidence of the illegal drug distribution. Disclosure also could jeopardize the safety of law enforcement personnel who are engaged in the execution of the arrest and search warrants and ongoing, proactive investigative activities.

Respectfully submitted,

Abhilash Pillai
Digitally signed by Abhilash Pillai
Date: 2024.04.02 13:25:23 -04'00'

Abhilash Pillai
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone on April 2nd 2024, in Hartford, Connecticut.

Robert A. Richardson
Digitally signed by Robert A. Richardson
Date: 2024.04.02 14:09:13 -04'00'

HON. Robert A. Richardson
UNITED STATES MAGISTRATE JUDGE

### ATTACHMENT A-1

**Property to Be Searched**

The premises located at ▮▮▮▮▮▮▮▮▮▮, East Hartford, Connecticut, ("**Target Premises**"), which is believed to be SPENCE's current residence. The building is located on the south-west side of ▮▮▮▮▮▮▮ and is a single-family residence that is primarily yellow in color. The **Target Premises** has the numbers "▮▮" clearly written in black, to the right of the front door. A photograph of the **Target Premises** is depicted below:



**ATTACHMENT A-2**

**Property to Be Searched**

A white 2023 Subaru Ascent with Vehicle Identification Number (VIN) ████████████5501 ("**Target Vehicle 1**"). **Target Vehicle 1** has been observed bearing Connecticut marker plate BM-19679. A photograph of **Target Vehicle 1** is depicted below:



**ATTACHMENT A-3**

**Property to Be Searched**

A black 2023 Dodge Durango with Vehicle Identification Number (VIN) ████████5579 ("**Target Vehicle 2**"). **Target Vehicle 2** has been observed bearing Illinois marker plate FP 190989. A photograph of **Target Vehicle 1** is depicted below:



## ATTACHMENT B

### Particular Things to be Seized

All evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Violate Federal Narcotics Laws), and 843(b) (Use of a Communications Facility to Facilitate Drug Trafficking Offenses), to include the following as they relate to the above-listed offenses:

a.    Controlled substances;

b.    Residue of controlled substances;

c.    Cell phones (*these items if located would be seized only, and if probable cause existed to search the contents, a separate warrant would be sought*);

d.    Paraphernalia and equipment for packaging, processing, diluting, cutting, weighing, and distributing controlled substances, for example: packaging material, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, as well as cutting agents and other substances used to process, dilute or cut controlled substances;

e.    Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

f.    Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

g.    United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

h.    Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

i.    Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

j.      Records of travel in furtherance of the unlawful distribution of drugs;

k.      Records of any communications relating to drug trafficking; and

l.      Firearms, ammunition and other weapons and destructive devices.

## ATTACHMENT C

**Property to Be Searched**

    The cellular phone, which is assigned phone number ███████-3047 and International Mobile Subscriber Identity (IMSI) number ██████████7973, which is serviced by T-Mobile and is believed to be located in the District of Connecticut and used by Brandon SPENCE ("**Target Telephone**").

    This warrant authorizes the forensic examination of the Target Telephone for the purpose of identifying the electronically stored information described in Attachment D.

## ATTACHMENT D

### Particular Things to be Seized

For the time period of January 1, 2024, through the present, all records and information on the Target Telephone that relate to violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Violate Federal Narcotics Laws), and 843(b) (Use of a Communications Facility to Further Drug Trafficking Offenses), to include the following as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of 21 U.S.C. §§ 841(a)(1), 846, and 843(b);

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9. images and videos in the memory of the telephone; and

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the telephone contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.